IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| STACY G. BRIDGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 5:12-cv-96 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Stacy Gilbert Bridge ("Bridge"), filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401– 433, 1381–1383f. Specifically, Bridge alleges that the ALJ erred in failing to accord adequate weight to the opinion of his treating physician, John W. Forbes III, M.D., and that the ALJ erred in failing to consider a drop in his intelligence quotient ("IQ") score.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 1382(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law. I conclude that the ALJ did not err in his evaluation of Dr. Forbes' opinion and that the ALJ did not err in evaluating Bridge's alleged impairments of intellectual functioning. Accordingly, I **RECOMMEND DENYING** Bridge's

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

Motion for Summary Judgment (Dkt. No. 12), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 20.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Bridge failed to demonstrate that he was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Bridge bears the burden of proving that he is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[2] (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Bridge was born on May 27, 1974 (Administrative Record, hereinafter "R." at 151), and was a younger person on his alleged onset date. R. 151; 20 C.F.R. § 404.1563(c). Bridge's last insured date is March 31, 2010. R. 22. He must show that his disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Bridge completed 12th grade, did not attend special education classes, and has not completed any type of special job training, trade or vocational school. R. 191. Bridge has held over a dozen jobs since 1999, including work as a

---

[2] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a).

3

painter, delivery man, dishwasher, janitor, stock clerk, and machine operator. R. 187–88, 301. Bridge reported that during the relevant period, he had the capacity to take care of his three dogs; dress, bathe, and feed himself without assistance; prepare his own meals daily; vacuum floors, mow grass, wash clothes, and clean dishes on a regular basis; go outside everyday and drive a car; and go shopping for groceries weekly. R. 248–50.

## Claim History

Bridge protectively applied for SSI and DIB on September 21, 2009, claiming that his disability began on January 1, 2003. R. 149–51, 158–163. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 20, 97, 101. On March 10, 2013, Administrative Law Judge ("ALJ") Thomas R. King held a hearing to consider Bridge's disability claim. R. 40-80. Bridge was represented by an attorney, Robert T. Garnett, at the hearing, which included testimony from Bridge, Bridge's friend Bobby Nicholas, Bridge's former wife Melissa Bridge, and a vocational expert. R. 40.

On April 28, 2011, the ALJ entered his decision denying Bridge's claims. R. 20–30. The ALJ found that Bridge suffered from the severe impairment of a "history of head trauma status post a motor vehicle accident in 1997, with gait and feet problems." R. 23. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 24–25. The ALJ further found that Bridge retained the RFC to perform simple, unskilled, sedentary jobs, with no additional limitations. R. 25–29. The ALJ determined that Bridge could not return to his past relevant work as a janitor, a pizza deliveryman, a fast food worker, a machine operator, a dishwasher, and a stock clerk (R. 29), but that Bridge could work at jobs that exist in significant numbers in the national economy: namely a general production worker, a material handler, and a packer job. R. 30. Thus, the ALJ concluded that he was not

4

disabled. R. 30. On July 17, 2012, the Appeals Council denied Bridge's request for review (R. 1-5), and this appeal followed.

## ANALYSIS

Bridge presents two arguments in the present appeal in contesting the basis of the ALJ's decision. First, Bridge contends that the ALJ failed to give proper deference to the opinion of Dr. John W. Forbes III, M.D., Bridge's treating physician. Second, Bridge alleges that the ALJ failed to resolve material inconsistencies in the evidence, in particular a drop in Bridge's intelligence quotient ("IQ").

### Treating Source Opinion

Bridge contends in this appeal that the ALJ failed to accord adequate weight to the opinion of Bridge's treating physician, Dr. John W. Forbes III of Stuarts Draft Family Practice. At issue are Dr. Forbes' conclusions contained in a Physical Residual Functional Capacity Questionnaire filled out on January 25, 2011. R. 390–94. In the questionnaire, Dr. Forbes diagnosed Bridge with a brain injury from a motor vehicle accident. Dr. Forbes further indicated that Bridge was incapable of even "low stress" jobs as the result of his alleged disabilities. "He has very little ability to handle any stress," Dr. Forbes stated in explaining his conclusion. R. 391. The ALJ considered Dr. Forbes' opinion in developing Bridge's RFC. The ALJ detailed Bridge's physical limitations set forth by Dr. Forbes, ultimately adopting them in the RFC by limiting Bridge to "no more than work at the sedentary exertional level." R. 28–29. As to Bridge's alleged mental limitations, the ALJ accorded "minimal weight" to the portion of Dr. Forbes' opinion stating that Bridge would be incapable of handling even low stress jobs. R. 29. The ALJ ultimately determined Bridge to be capable of performing simple, unskilled, sedentary jobs. R. 25.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010).

In this case, the ALJ's decision to accord the portion of Dr. Forbes' relating to Bridge's alleged mental impairments is supported by substantial evidence in the record. The relevant medical evidence shows that Bridge suffered a traumatic brain injury in a motor vehicle accident in July 1997. R. 304, 325, 340. Bridge was in a coma for over a month. R. 304. By September 2003, Bridge had recovered at least to the extent that doctors proclaimed him "able to work [without] restriction" (R. 320) and "able to take care of his personal and financial affairs." R. 340. After his only check up in 2004, Bridge was referred to Gerald R. Showalter, Psy.D., a neuropsychologist and licensed clinical psychologist, who completed a neuropsychological evaluation on January 18, 2005. Dr. Showalter noted that Bridge had held numerous work

positions since 1998 and that Bridge reported "problems maintaining employment, however, due to a combination of slow work speed, disinhibited verbosity, and a tendency to 'take things too personally.'" R. 304–05. Bridge stated to Dr. Showalter that he chose not to follow up with therapy services after the accident because he considered himself recovered. R. 304.

Dr. Showalter found Bridge's psychiatric history to be "completely unremarkable." Dr. Showalter found Bridge to be alert and oriented, with a euthymic mood, and anxious affect. R. 305–06. Bridge reported occasional panic and frustration, and a decreased energy level in recent months. R. 306. Bridge obtained a full-scale IQ score of 94, placing his overall intellectual functioning within the average range, a "modest improvement in overall intellectual functioning since he was previously evaluated in December 1997." R. 306. Dr. Showalter concluded that Bridge "experienced improved overall neurocognitive efficiency over the course of time since his injury" and that he might see further improvement with relief of his symptoms of depression and anxiety. R. 308. Accordingly, Dr. Showalter recommended antidepressant medication, vocational rehabilitation, and further counseling. R. 308.

On March 6, 2005, Bridge had an x-ray and a CT scan following a suspected seizure. R. 322–23. The x-ray was negative, but the CT scan revealed low density in the white matter of both frontal horns of the brain, consistent with prior head trauma. R. 323. An EEG in March 2005 was "mildly abnormal . . . secondary to diffuse mild voltage suppression" with "no hallmarks of epilepsy" and no seizures in the record. R. 331. The record later shows that the reported seizure was "in the setting of substance abuse" and that Bridge was reluctant to give all the details surrounding the incident. R. 302. However, Bridge began taking Depakote to treat possible seizures. R. 314.

7

A clinic note from Stuarts Draft Family Practice on May 31, 2005 states that Bridge was doing much better, that work was "going well" and that he was seeing Dr. Showalter for counseling. R. 315. On August 12, 2005, Bridge was "doing great" on his medication. R. 315. In June 2006, Bridge fell from a roof while doing work, breaking his elbow but avoiding other serious injuries. R. 311. In January 2007, Bridge reported that he had not had seizures for at least a year and a half,[3] that he continued to take Depakote, and that he was not depressed but was "happy." R. 310. His family doctor indicated that Depakote may have helped with his mood stabilization in addition to any seizure disorder. R. 302, 309.

In February 2008, Bridge asked to stop taking Depakote, even though the medication helped with his mood stabilization. R. 302. Dr. Hatter at Stuarts Draft Family Practice cautioned him against this, but allowed Bridge to taper off his medication. At the visit, Bridge denied alcohol and drug use and stated he had the same job for six years as a painter. R. 302.

More than a year passed before Bridge again visited his family doctor. On September 15, 2009, Bridge saw Dr. Hatter "primarily to talk" about his difficulty getting gainful employment. R. 301. Bridge discussed his numerous jobs—14 in the last 10 years—including his current part-time cleaning job, and how his slow pace has affected his job performance. R. 301. Dr. Hatter stated that he had now been off Depakote for over a year but has not had any further seizures. Dr. Hatter observed Bridge to be "alert, able to carry on a conversation and affect seems within normal limits here today." R. 301. Dr. Hatter offered to have screening labs performed, but Bridge refused. Dr. Hatter agreed to write a letter to Bridge's attorneys to assist him in gaining disability. R. 301.

---

[3] On January 30, 2007, a clinic note from Stuart Draft Family Practice notes that Bridge hadn't had a seizure for "several years."

Joseph J. Cianciolo, Ph.D, a licensed clinical psychologist, conducted a consultative assessment of Bridge on April 1, 2010. R. 343–45. Bridge discussed his occupational problems with Dr. Cianciolo, reporting that his employer as a painter had understood that he worked slowly, but that he had been laid off after six years due to lack of work for the contractor. R. 343. Dr. Ciancolo observed Bridge to be alert and fully oriented, with a euthymic mood and blunt affect. R. 344. Bridge's thoughts were logical and goal directed, his insight was appropriately developed, and Bridge put forth his best effort during the examination. R. 344. Bridge obtained a full-scale IQ score of 84, which placed Bridge within the low average range, and a global assessment of functioning (GAF) of 60. R. 344. Dr. Cianciolo concluded that "[r]esults of the intellectual assessment place his overall level of functioning within the average range" and that

> it appears the patient is capable performing [sic] simple and repetitive tasks as well as detailed and complex tasks. His ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and completing a normal workday or workweek without interruption from psychiatric condition appears to be relatively unimpaired. It is not likely that he would require additional supervision. He does appear to be capable of accepting instruction from supervisors. His ability to interact with coworkers and the public as well as coping with routine stressors encountered in competitive work appears to be relatively unimpaired. There is no indication for inpatient or outpatient psychiatric treatment at the present time. The patient does appear to be capable of adequately managing his own funds. Prognosis for significant change would appear to be guarded.

R. 345.

Bridge returned to Stuarts Draft Family Practice on August 25, 2010 to see Dr. Forbes. R. 385. Bridge stated that he had been under increased stress due to his wife leaving him and that now he is living by himself. Bridge's situation had "gotten him somewhat depressed" continued to apply for jobs. R. 385. Dr. Forbes prescribed Paxil to help with Bridge's depression and anxiety.

Patricia Cott, Ph.D, a state agency medical consultant, completed a Psychiatric Review Technique form on April 23, 2010. R. 353–66. Dr. Cott found "no medically determinable impairment" and found that Bridge's "intellectual assessment place his overall level of functioning within the average range." R. 353, 365. Dr. Cott also noted that Bridge had a history of seizures, which was stable off medication and had no indication of residual effects. R. 365. Jaqueline McMorris, M.D., a state agency physician, provided an assessment of Bridge's residual functioning capacity on April 28, 2010. R. 367–68. Dr. McMorris stated that Bridge "appears to have made much improvement since his accident and his condition appears to presently be not severe." R. 367.

Dr. Forbes filled out the RFC questionnaire at issue in this appeal on January 25, 2011. R. 390–94. Dr. Forbes diagnosed Bridge's brain injury, and indicated that "he seems to have reached about as well as he will be." R. 390. Dr. Forbes indicated that Bridge has trouble working and "can't stay on one job very long" and has difficulty getting along with fellow employees. R. 390. When asked about what treatment was given to Bridge, Dr. Forbes said that Bridge takes Depakote, although other records show that Bridge had been off Depakote for some time. R. 390, 301. Dr. Forbes noted depression and personality disorder, indicated that Bridge's symptoms will frequently interfere with his attention and concentration, and that Bridge was incapable of handling even "low stress" jobs, and that Bridge "has very little ability to handle any stress." R. 391. Dr. Forbes detailed a number of physical limitations, including Bridge's limits sitting and standing, the need to take breaks, and expected absences from work. R. 393.

On appeal, Bridge argues that the ALJ "never explicitly states how much weight he accords *all* segments of Dr. Forbes' opinion." Pl.'s Br. Summ. J. 5 (emphasis in original). However, the weight given to Dr. Forbes' opinion is sufficiently clear from the ALJ's opinion.

First, it should be noted that the ALJ adopts all of Bridge's physical restrictions indicated by Dr. Forbes. "In giving the benefit of the doubt to [Bridge]," the ALJ's opinion reads, "I believe his physical restrictions limit him to no more than work at the sedentary exertional level." R. 28–29. Although not explicitly stating so, the ALJ gives this portion of Dr. Forbes' opinion controlling weight. R. 28–29. Next, the ALJ considers the portion of Dr. Forbes' opinion regarding Bridge's mental impairments, namely, that "due to depression and a personality disorder, the claimant would be incapable of handling even low stress jobs." R. 29. In light of the inconsistent longitudinal record outlined above, the ALJ accorded this portion of Dr. Forbes' opinion minimal weight.

While perhaps it would have been more thorough for the ALJ to address the support in the record for each and every portion of Dr. Forbes' opinion of disability, the failure to do so does not undermine the ALJ's ultimate conclusion. While the ALJ's analysis of Dr. Forbes' opinion is brief, ultimately the ALJ's opinion is supported by substantial evidence. Indeed, "'[p]rocedural perfection in administrative proceedings is not required' and courts should not vacate a judgment unless the substantial rights of a party have been affected." Cameron v. Astrue, 7:10CV00058, 2011 WL 2945817, at *3 (W.D. Va. July 21, 2011) (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988).

The ALJ exhaustively analyzed the evidence relating to Bridge's mental capabilities, including the assessment by Dr. Showalter, the treatment at the Stuart's Draft Family Practice and the psychological assessment of Dr. Cianciolo. In contrast, a dearth of evidence exists in the record supporting Bridge's alleged mental impairments, especially in the first two years following his alleged disability onset date. Although Bridge claims disability starting on January 1, 2003, records from his treating physicians at Stuarts Draft Family Practice—including Dr.

Forbes—indicate that Bridge was not disabled well into 2003. Bridge received a doctor's note indicating that he could work without restriction in April 2003 (R. 312) as well as a letter in September 2003 stating that Bridge was capable of handling his personal and financial affairs. R. 340. Moreover, only one record exists from 2004: a clinic note from a check-up in November that contains almost no detail. Even Dr. Showalter's neuropsychological evaluation from January 2005 doesn't lend much support to Bridge's position. Although Bridge reported difficulty at work, Dr. Showalter's observations were largely unremarkable and Bridge's intellectual functioning was in the average range. R. 305–06. If anything, Dr. Showalter's report shows improvement from Bridge's 1997 accident.

Additionally, it appears that Bridge's mental health stabilized while on medication. After Bridge's reported seizure in March 2005, which may have been substance abuse related (R. 302), doctors placed Bridge on Depakote, a seizure medication that doctors' hoped would help Bridge's anxiety and depression as well. Treatment records from August 2005 and January 2007 confirm that the medicine helped improve his mood, and Bridge did not have any subsequent seizures. R. 310, 315. After Bridge requested that he taper off of Depakote in February 2008 (R. 302), there is a significant gap of more than a year before Bridge sought treatment again. When Bridge next sought treatment from Dr. Hatter in September 2009, he reported difficulties maintaining a job due to his impairment. However, outside of Bridge's self-reporting, none of Dr. Hatter's notes from that visit reflect any disabling impairment. Indeed, Dr. Hatter noted that Bridge was stable off his seizure medication, that Bridge was alert, able to carry on a conversation, and had a normal affect. R. 301. Bridge also refused lab work screens. Dr. Hatter noted Bridge's difficulty maintaining employment, but made no substantive assertions regarding his alleged occupational limitations.

Dr. Forbes' opinions regarding Bridge's alleged mental impairments are also called into question by notable inconsistencies with the rest of Bridge's medical records. For example, on the January 25, 2011 form, Dr. Forbes indicates that Bridge continued to take Depakote. R. 390. However, treatment records from Dr. Forbes' own practice show that Bridge had been off of the medication since at least September 2008. R. 377. Furthermore, in the RFC questionnaire Dr. Forbes indicated that Bridge had a personality disorder that affected his physical condition. However, no treating or examining source in the record ever diagnosed Bridge with a personality disorder. Dr. Forbes also noted that Bridge had difficulty getting along with fellow employees (R. 390) although Bridge indicated no such difficulties in his function report. R. 253.

Dr. Forbes had seen Bridge "off and on since birth." R. 390. Although this may appear to favor deference of Dr. Forbes' opinion, the infrequency and sporadic records of treatment countervail this notion. Bridge also contends without supporting authority that Dr. Forbes, a family practitioner, is a "specialist" deserving of greater deference because "[t]he medical community now recognizes this as a specialty." Pl.'s Br. Summ. J. 6. Nothing in the records suggests anything other than Dr. Forbes being a general practitioner, with no particular specialization relevant to Bridge's mental health. Therefore, the ALJ could weigh this factor against Dr. Forbes' opinion of disability. See Thompson v. Colvin, CIV.A. 1:12-01551, 2013 WL 4742776, at *19 (S.D.W. Va. Sept. 3, 2013) (finding that ALJ appropriately noted that treating physician was a "family practitioner" as reason to give opinion regarding muscle disorder less weight); see also Perdue v. Comm'r, Soc. Sec. Admin., CIV. SAG-11-3408, 2013 WL 1942160, at *2 (D. Md. May 7, 2013) (finding that ALJ could assign little weight to family practitioner's opinion regarding claimant's mental capacity where doctor had "no specialization in mental health fields.").

Dr. Cionciolo's thorough consultative assessment, finding Bridge unimpaired from a mental standpoint, is well supported by the record. "State agency medical and psychological consultants … are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation," and therefore, the ALJ "must consider their findings except for the ultimate determination about whether a claimant is disabled." 20 CFR § 404.1527(e)(2)(i). Moreover, the findings of both state agency doctors, Dr. Cott and Dr. McMorris, support the ALJ's finding that Bridge is capable of performing simple, unskilled, sedentary jobs. These opinions, combined with the lack of support in the record supporting Bridge's mental impairments, provide a substantial basis for the ALJ's opinion. Accordingly, I find that remand is not warranted on the grounds that the ALJ erred in considering the opinion of Bridge's treating physician.

### **Inconsistencies in IQ Scores**

Bridge also alleges that the ALJ erred in "resolv[ing] material inconsistencies in the evidence," in particular a ten-point drop in Bridge's IQ score from 2005 to 2010. Pl.'s Br. Summ. J. 3. Bridge contends that this was a "highly significant factor that the judge failed to even consider." I find that although the ALJ did not specifically analyze Bridge's intellectual functioning in terms of Bridge's IQ scores, the ALJ adequately considered the totality of the relevant medical evidence in the pertinent opinions.

When Dr. Showalter of Woodrow Wilson Rehabilitation Center evaluated Bridge on January 18, 2005, Bridge obtained a full-scale IQ score of 94, which placed Bridge in the 34th percentile and within the average range of intellectual functioning. R. 306. On April 1, 2010, when Dr. Cianciolo evaluated Bridge's intellectual functioning, Bridge obtained a full-scale IQ score of 84, which placed Bridge in the low average range. R. 344.

Bridge fails to recognize that, notwithstanding the IQ scores, both Dr. Showalter and Dr. Cianciolo both ultimately conclude that Bridge's overall intellectual functioning was in the average range. R. 306, 345. Both doctors holistically examined the evidence, which included both a clinical interview as well as a review of the available medical records. R. 305, 344. The ALJ thoroughly reviewed both reports and accurately noted each doctor's overall conclusion in the opinion while formulating Bridge's RFC. R. 26–27. Contrary to Bridge's suggestion, the ALJ did not ignore evidence regarding Bridge's intellectual functioning at the time the two opinions were rendered.

In any event, Dr. Cianciolo's later report is not supportive of Bridge's alleged disability. Even considering a lowered IQ score, Dr. Cianciolo found that Bridge was capable of performing "simple and repetitive tasks as well as detailed and complex tasks." R. 345. Dr. Cianciolo also found unimpaired Bridge's ability to maintain regular attendance, perform work consistently, complete a normal workday, and interact with co-workers and the public. R. 345. Bridge merely isolates the lowered IQ score without addressing the remainder of Dr. Cianciolo's opinions from the same report. I find that remand is not warranted on these grounds.

## Conclusion

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

                                                Enter: January 21, 2014

                                                *Robert S. Ballou*

                                                Robert S. Ballou
                                                United States Magistrate Judge